**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CIVIL DIVISION

CASE NO.:

MS LEISURE CORPORATION, a
Florida corporation,

      Plaintiff,

v.

MIAMI-DADE COUNTY, FLORIDA, a
political subdivision of the State of Florida.

      Defendant.          /

**COMPLAINT**

Plaintiff, MS LEISURE CORPORATION, brings this Complaint against MIAMI-DADE

COUNTY, FLORIDA and alleges the following:

**THE PARTIES**

At all times material to this action:

1.      Plaintiff, MS Leisure Corporation ("MS Leisure"), is a part of The Dolphin

Company, a worldwide corporation with 30 years of experience in marine wildlife.  The Dolphin

Company owns over 20 marine life parks in 8 countries, including four in the State of Florida.

MS Leisure operates the Miami Seaquarium (the "Seaquarium") in Miami, Florida and is the

only entity licensed to do so by the United States Department of Agriculture ("USDA").

2.      Defendant, Miami-Dade County (the "County"), is a public entity incorporated

under the laws of the State of Florida, and is responsible for establishing, organizing, operating,

enacting, and establishing policy for Miami-Dade County, Florida.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Section 11 of the Endangered Species Act (ESA), 16 U.S.C. § 1540 (c), (g); 28 U.S.C. § 1331; and 42 U.S.C. § 1983.  The Court may grant the relief requested herein pursuant to 16 U.S.C. § 1540(g)(1)(A), (2)(c).

4.      MS Leisure also requests that this Court exercise supplemental jurisdiction over its state law claim pursuant to 28 U.S.C. § 1367(a) because it arises from the same operative set of facts.

5.      Venue is proper because the events giving rise to the claims all occurred within Miami-Dade County, which is in the Southern District of Florida.

## FACTS GIVING RISE TO THE CLAIMS

6.      In 1954, Fred D. Coppock had a dream of creating a marine life park that could use entertainment to educate the public about the beauty and importance of marine life.

7.      That same year, the Miami-Dade County Board of County Commissioners and Marine Exhibition Corporation (MEC) entered into a lease agreement for the construction, operation, and maintenance of a marine life park.

8.      The agreement allowed MEC to convert 38 acres of County owned land into a marine life park called the Miami Seaquarium.

9.      The land is located between Key Biscayne and the City of Miami and overlooks Biscayne Bay.

10.     The Seaquarium officially opened in 1955, becoming the first marine-life attraction in South Florida, and one of the first in the United States.

11.     For almost 70 years, the Seaquarium has been a beacon of marine-life conservation, education, and entertainment.

2

12.     Over the years, the Board of County Commissioners approved amendments to, and transfers of, the lease agreement.

13.     For instance, in 2012, MEC transferred the lease agreement to Fun Festival Parks, LLC.

14.     In March of 2022, Fun Festival Parks transferred the lease agreement to MS Leisure.

15.     The Board of County Commissioners delegated its policymaking authority for the Mayor's office to execute the agreement between the County and MS Leisure.

16.     The current lease agreement between the County and MS Leisure expires on November 26, 2044.[1]

17.     The iconic marine life park has captured the hearts of visitors from around the world, offering a unique glimpse into the wonders of the sea.

18.     In the 1970's, the Seaquarium was the home of the popular television show Flipper and has hosted a plethora of movie and television films – creating a unique bond between dolphins and humans.

19.     The Seaquarium has also been committed to promoting marine conservation and education.

20.     The Seaquarium's team of dedicated experts, including marine biologists and animal trainers, work tirelessly to provide visitors with informative and engaging experiences.

21.     Through educational shows, interactive exhibits, and conservation programs, the Seaquarium inspires guests of all ages to learn more about the ocean and its fascinating inhabitants.

---

[1] MS Leisure has the unilateral right to extend the lease if it makes certain capital improvements.

22.     The Seaquarium is currently home to over 1,000 animals, mammals, birds, fish, and invertebrates.

**Federal Regulations**

23.     MS Leisure is the only entity licensed by the USDA to care for the animals at the Seaquarium.

24.     The USDA licensing process is rigorous, and the USDA only issues licenses after an entity has shown the requisite knowledge, skill, and expertise.

25.     Many of the animals at the Seaquarium are regulated pursuant to the Endangered Species Act (ESA), the Animal Welfare Act (AWA), the Marine Mammal Protection Act (MMPA), and the Migratory Bird Treaty Act (MBTA) – all federal regulations.

26.     These statutes govern everything from habitat size, enrichment plans, veterinary care, to watering and feeding.

27.     These statutes also dictate a myriad of overlapping requirements for the ownership, care, housing, and transportation of these animals.

28.     Any transfer and/or transport of an animal, much less a precipitous one, must also comply with federal law.

29.     Certain species cannot even be possessed in certain jurisdictions unless the owner has an active license from the United States Department of Agriculture (USDA).

30.     The Endangered Species Act (ESA) is a federal law that protects species that are classified as "endangered" or "threatened."

31.     Under the ESA, it is illegal to "take, possess, sell, deliver, carry, transport or ship" endangered or threatened animals without first obtaining a permit and license. 16 U.S.C. § 1538(a).

32.     "Taking" a covered animal includes any action that will "harass" or "harm" the animal.  50 C.F.R. § 17.3.

33.     The ESA defines "harass" as any action that "creates the likelihood of annoying wildlife to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering."

34.     The ESA defines "harm" as any act that injures wildlife, which may include "significant habitat modification … by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."

35.     The ESA prohibits such acts because acclimating animals to new habitats, routines, and caregivers, introduces stress and uncertainty into animals lives, which can greatly impact their health and well-being.

36.     This can be particularly true for animals that are not acclimated to transport procedures (such as entering crates or travel enclosures), have health issues, are of advanced age, or are in the midst of a reproductive or mating cycle.

37.     For such animals, the transport or transfer could constitute a "take" that would require a federal permit prior to taking such an action. 16 U.S.C. § 1539(a)(1)(B).

38.     The permitting process is lengthy and complicated – and issuance is subject to the agency's findings.

39.     Such a permit must be submitted to National Marine Fisheries Service (for marine species) and to the U.S. Fish and Wildlife Service (for terrestrial and freshwater species) and thereafter published in the Federal Register for notice and public comment.

40.     Such permits can take multiple years to be issued.

41.     The Seaquarium currently houses 12 animals that are classified as "endangered" under the ESA, including nine African Penguins, two Scarlet Macaws, and one Military Macaw.

42.     The Seaquarium also houses two animals classified under the ESA as "threatened," including a White Cockatoos and a Salmon Crested Cockatoos.

43.     To date, no entity has secured a permit to take, possess, sell, deliver, carry, transport or ship any of the endangered or threatened species at the Seaquarium.

44.     Other species currently residing at the Seaquarium are American Flamingos, which are protected by the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703-712.

45.     The MBTA, much like the ESA, prohibits the taking (including killing, capturing, selling, trading and transport) of protected migratory bird species without prior authorization by the U.S. Fish and Wildlife Service.

46.     A special purpose permit is required before any person may lawfully "take, salvage, otherwise acquire, transport, or possess migratory birds." 50 C.F.R. § 21.95.

47.     For example, a special purpose permit for education purposes is required before any covered bird can be possessed or transported, and there are specified handling, training, and husbandry requirements necessary for any caretaker of a migratory bird falling into this category.

48.     Transferring or transporting species that are covered by MBTA is not allowed unless and until these requirements are satisfied and a permit is issued.

49.     The Seaquarium houses over 25 American Flamingos that are regulated by the MBTA.

50.     To date, no entity has secured a permit to take, salvage, otherwise acquire, transport, or possess the migratory birds at the Seaquarium.

51.     Again, MS Leisure is the only entity licensed to care for any of the animals at the Seaquarium.

**The County's Assignment of Lease to MS Leisure**

52.     Since 2021 (at a minimum), the County became increasingly concerned about Fun Festival Parks' - the entity operating the Seaquarium before MS Leisure - maintenance of the Seaquarium and its care of the animals.

53.     According to the County, the Seaquarium had "fallen into disrepair," including its infrastructure.

54.     Therefore, on October 19, 2021, the County passed a resolution preliminarily approving the assignment of Festival Fun Parks' lease agreement to MS Leisure.

55.     Before assigning the lease, MS Leisure had to secure the requisite licenses from the USDA.

56.     Furthermore, the County performed a due diligence check on MS Leisure before assigning the lease.

57.     During its due diligence inspection, the County specifically found the following facts about MS Leisure and The Dolphin Company, as stated in County Resolution R991-21:

    i.     The Dolphin Company had extensive expertise in the operation of zoos and aquariums facilities throughout the world and [is] accredited by several agencies, including the Association of Zoos & Aquariums (AZA).

    ii.    The Dolphin Company is committed to the preservation of the environment and the environmental education of the communities where it operates.

    iii.   The Dolphin Company's Marine Mammal Specialists and Environmental Educators have visited over 230,000 schools worldwide to teach children about

7

conservation and has conducted over 130,000 educational tours of their aquatic habitats to provide students with first-hand environmental learning opportunities.

iv.   The Dolphin Company and its facilities have been accredited by the Alliance of Marine Mammal Parks and Aquariums (AMMPA), International Association of Marine Animal Trainers (IMATA), Association of Zoos and Aquariums (AZA), certified by American Humane, a member of the International Association of Amusement Parks and Attractions (IAAPA), and a founding member of the Mexican Association of Habitats for the interaction and protection of marine mammals (AMHMAR), among others.

v.   In Florida, The Dolphin Company, through its USA subsidiaries, operates Gulf World in Panama City Beach, Marineland in St. Augustine, and Dolphin Connection in Duck Key. The Assignee is a Florida corporation based in St, Augustine, Florida.

vi.   The [Dolphin Company] has a proven track record of achieving the highest certification levels for its facilities and has similarly committed to achieving for the Seaquarium an accreditation by AMMPA and to secure AZA certification, which is regarded as the gold standard certification in the zoo and aquarium industry.

vii.   Additionally, the [Dolphin Company] has agreed to future Lease amendments, subject to approval by the Board, aimed at reinforcing the commitments to the highest levels of infrastructure maintenance, animal and welfare management, certification requirements, and conservation education.

8

viii.   [T]he assignment of the Lease from Fun Festival Parks to MS Leisure is in the best interest of the County because the [Dolphin Company] is a large, experienced, animal-welfare focused, and well-established aquatic park, habitat, and marina operator that is aligned with the County's goals and objectives of conservation and education.

ix.   The [Dolphin Company] has the proven capacity and is committed to achieving and maintaining the highest standards of infrastructure maintenance, animal welfare and management, and certification requirements for the Seaquarium.

58.   Although the Board of County Commissioners preliminarily approved the lease assignment in October of 2021, the transfer of the Seaquarium to MS Leisure did not occur until March 2022.

59.   Between October 2021 and March 2022, Fun Festival Parks still operated the Seaquarium.

60.   Before transferring the lease to MS Leisure, the County imposed several conditions, including:

i.   Fun Festival Parks had to clear all 21 violations issued by the USDA.

ii.   MS Leisure had to secure an operational license from the USDA.

iii.   MS Leisure had to agree to suspend the exhibit of Toki, the killer whale, which was the park's main attraction, and was also prohibited from selling materials related to Toki, such as t-shirts, mugs, key chains, etc.[2]

---

[2] Regardless of the restrictions agreed to by MS Leisure and the business impact it had on the company, MS Leisure had Toki's best interest in mind, and even explored the possibility to relocate her to a contained habitat in the ocean. MS Leisure upheld its commitment to close Toki's exhibit and not sell merchandise, even though its projected revenue would decrease by over 25%.

61.     After the transfer, MS Leisure had to replace a substantial portion of the Seaquarium's staff, which did not meet the required standards of The Dolphin Company.

62.     Operating such a heavily regulated industry requires employing professionals who are capable of performing the work.

63.     Since marine life parks are unique, it took several months for MS Leisure to find the proper staff.

**The County leased MS Leisure "a lemon."**

64.     The County agreed to transfer MS Leisure the right to operate a facility that had cleared USDA inspection, but actually transferred MS Leisure "a facility in disrepair."

65.     Many structures were built in the 1950s and were either poorly built, poorly maintained, or both.[3]

66.     The County was clearly aware of the Seaquarium's longstanding structural issues.

67.     For instance, in September of 2003, the County issued 52 separate notices of code violations to MEC – the operator at the time.

68.     Many violations were related to concrete damage and damage to structural support beams.

---

[3] Although MS Leisure took over a facility "in disrepair," it always kept the animals in a safe environment and even improved the structures when feasible.

 

69.     The County provided MEC with an infinite amount of time to repair the damage.

70.     Also in September 2003, the County found the following violations at the water treatment facility:

"All wood manzards and paratets are not to code and not properly anchored, steps and handrails on steel ladder to catwalk damaged due to corrosion, outside stair connecting filter room to generator room have rust damage at the majority of connection and anchoring points and a large crack at the northeast corner of building."

 

71.     The County gave MEC <u>ten years</u> to build another water treatment facility.

72.     Also in 2003, the County found the following violation:

"At main tank: Steel post bases supporting canopy are rusted and need to be replaced and re-anchored, storage closets missing locks also rail above tank wall broken and improperly repaired.

73.     As seen in the photograph below, taken almost two years later, MEC still had not repaired the violation.



74.     However, the County never moved to terminate MEC's lease agreement.

75.     The County even allowed MEC an excessive amount of time to fix simple repairs.

76.     For instance, the electrical room in the Golden Dome needed repairs to the gutter seals, strapping of conduits, grounding conductor, and rust damage to elect panels.



77.     Although the County first raised this issue in 2003, it gave MEC until **February 2007** to repair the issue, and never attempted to terminate the lease.

78.     Even as late as August 2021, the County cited Fun Festival Parks for cracks in the walls of Corridor A, cracks in the Golden Dome, and structural damage to the Whale Bowl.



79.     The Seaquarium's infrastructure had a long history of neglect and structural damage that the County knew about *well before* MS Leisure took over.

**MS Leisure's Substantial Investments**

80.     MS Leisure took immediate steps to repair the Seaquarium and initially focused on any issue that could potentially harm its animals or patrons.

81.     In less than two years, MS Leisure invested over $2,000,000.00 for the care and maintenance of animals, plus an additional $1,000,000.00 in capital improvements for upgrades to the Seaquarium's infrastructure.

82.     For instance, MS Leisure invested nearly $400,000.00 for infrastructure upgrades to the Whale Pool in order to protect Toki, the killer whale.

83.     MS Leisure purchased a brand new $200,000.00 floating deck for Dolphin Stadium.



84.     The old deck was made from wood and could potentially harm the dolphins.

85.     Additionally, the company spent approximately $120,000.00 to install sunshades in various locations to protect the dolphins from the sun.



86.     MS Leisure has also paid more than $2,000,000 in lease payment to the County over the last two years.

87.     The County was incredibly pleased with its new relationship with MS Leisure and its investments in the Seaquarium.

88.     In March 2023, the County's Mayor, Daniella Levine-Cava, even attended a press conference together with Eduardo Albor, the CEO of The Dolphin Company, which is MS Leisure's parent company.

89.     Together, they announced a collaborative agreement with Friends of Toki, a non-profit conservation group, to explore the possibility of relocating Toki back to her natural habitat.

90.     The Mayor and Mr. Albor could not have been more complimentary towards each other.  See https://www.youtube.com/live/GPGdA3R5I54?si=VPz1hTigrrlDX1c-

91.     The Mayor complimented MS Leisure's care of Toki since taking over the Seaquarium.

92.     According to the Mayor, Toki's health was rapidly deteriorating under the care of the prior owners, Fun Festival Parks.  But within a few months of MS Leisure taking over the Seaquarium, Toki's condition drastically improved.

93.     The Mayor stated that the County's veterinarian staff, The Dolphin Company, the Seaquarium's staff, and the Friends of Toki, all collaborated to care for Toki since MS Leisure took over in March of 2022.

94.     All parties did everything in their power to give Toki the best veterinarian care possible.

95.     The Mayor even stated that "Miami-Dade County has successfully overseen the transfer of ownership of the Miami Seaquarium to [MS Leisure], who, in a partnership with the Friends of Toki, have stewarded her medical care."

96.     The Mayor continued, "Because of that newly minted partnership, and the ***increased trust and transparency***, I believe we are standing here today for the momentous announcement." (emphasis added)

97.     From June 2023 to December 2023, representatives from the County and MS Leisure met on a weekly basis to address any concerns about the Seaquarium.

98.     The parties acted in good-faith and wanted to keep an open line of continuous communication.

99.     During the meetings, no one from the County ever expressed concerns to MS Leisure about the care of animals or any alleged code violations.

100.    The parties remained positive and complimentary to each other.

101.    As late as October 2023, the Mayor even invited Mr. Albor to her office to discuss the future plans of the Seaquarium.

102.    During the meeting, the Mayor never expressed any concerns that she had over MS Leisure's maintenance of the Seaquarium.

103.    The Mayor only had positive comments and expressed her gratitude for their continued partnership.

**MS Leisure Criticized the County**

104.    All that changed, however, on December 12, 2023, when Mr. Albor responded to an email sent by Perry Perez, the Chief Procurement Officer for the County.[4]

105.    Mr. Albor criticized Mr. Perez for such a disrespectful email sent to the Seaquarium, which included allegations that were completely false.

106.    Mr. Albor warned Mr. Perez about the tone of his email and inquired whether his words were "the Mayor's words."

107.    Mr. Albor then stated, "I will assume the disrespect comes from the Mayor as well and will look for her and ask her."

108.    Mr. Albor copied Jimmy Morales, who works in the Mayor's Office as the Chief Operating Officer for the County.

109.    On December 13, 2023, *the day after Mr. Albor's email*, the County weaponized its code enforcement staff and deployed enforcement officers to the Seaquarium in order to retaliate against MS Leisure.

110.    The County generated a Notice of Violation Report, which listed over 40 code violations.

---

[4] Mr. Perez accused the Seaquarium of failing to "provide the County with advance notice and insight into the relocation of … manatees."  Mr. Perez further stated, "[t]he Seaquarium's lack of transparency concerning this issue of significance and concern to both the public and the County is extremely troubling and unacceptable given the business relationship between the parties…." Mr. Perez continued, "the Seaquarium's failure to provide us with timely prior notice regarding an issue of such significance constitutes a grave disservice to our citizens."

111.    MS Leisure was shocked because: (i) all of the violations were present before the County approved the lease assignment; (ii) the Mayor had just praised [MS Leisure's] commitment to improving the Seaquarium; (iii) the County was aware that MS Leisure spent over $1,000,000.00 on structural upgrades to the Seaquarium; and (iv) MS Leisure was still actively upgrading the property.

112.    It is important to note that, when the County assigned the lease to MS Leisure, it could have easily required MS Leisure to fix all 40 supposed violations, as the County inspected the property before the lease assignment.  However, the County imposed no such requirement.

113.    Many of the alleged code violations were for shipping containers, storage sheds, and tool sheds that had been on the property (in areas closed to the public) for decades without the County objecting - but all of a sudden became "code violations" after December 13, 2023.






114.     The County was clearly retaliating against MS Leisure for Mr. Albor's criticism of the County.

115.     On December 22, 2023, the County issued a Notice of Default to MS Leisure, alleging several building code violations.

116.     The County claimed that MS Leisure failed to maintain Flipper Stadium, Dolphin Stadium, and the Manatee Tank Area, and "failed to maintain the property in a good state of repair."

117.     The County's position was severely flawed because MS Leisure inherited these problems from Fun Festival Parks.

118.     In other words, MS Leisure could not *maintain* the property "in a good state of repair" since the property was never in "a good state of repair" when MS Leisure took over. [5]

119.     Nevertheless, the Seaquarium took corrective action to resolve any concerns raised by the County, even if it did not agree with the County's assessment.  The contract allowed MS Leisure a reasonable time to correct any violation.

120.     Of the 40 plus code violations, MS Leisure immediately corrected all the smaller violations that did not require a massive overhaul.

121.     More complex violations, such as demolition of the Whale Bowl, would obviously take more time.

122.     On January 15, 2024, Jimmy Morales finally responded to Mr. Albor's December 12, 2023, email to Perry Perez, which was almost a month later.

---

[5] The County even acknowledged that the Seaquarium was "in a state of disrepair" in County Resolution No. R991-21.

123.   Mr. Morales asked Mr. Albor to give him a call that day about a USDA report.

124.   Mr. Albor called Mr. Morales several times that day, but Mr. Morales did not answer.

125.   Mr. Albor then emailed Mr. Morales and explained his multiple attempts to contact Mr. Morales that day.

126.   Mr. Albor explained that the information Mr. Morales received was untruthful and misleading, and that the County has not been properly informed.

127.   Mr. Morales responded, "Let's talk tomorrow and meet later in the week," as he was consumed with family issues.

128.   Mr. Albor called and emailed Mr. Morales on January 16, 2024; but Mr. Morales still did not answer or respond.

129.   On January 20, 2024, Mr. Albor sent Mr. Morales an email explaining how he had called Mr. Morales daily, seeking to speak to him, and that Mr. Albor was under the impression that it was an urgent matter.

130.   Mr. Albor also requested a meeting with the Mayor to express his concerns about the inappropriate actions taken by the County, *i.e.:* (i) issuing groundless notices of default; (ii) disclosing false information to the public, which County official learned and misinterpreted during a private USDA inspection; and (iii) refusing to conduct their weekly meeting or communicate with him as they had done from June 2023 to December 2023.

131.   No one from the Mayor's office responded to Mr. Albor until Thursday, March 7, 2024, when Mr. Morales wrote a letter addressed to Mr. Albor entitled, "Notice of Termination of Lease Agreement and Additional Notice of Defaults."

132.    In the letter, the County listed several inaccuracies about MS Leisure's care and treatment of the animals and maintenance of the facility.

133.    The County demanded that MS Leisure surrender and deliver possession of the Seaquarium back to the County no later than April 21, 2024.

134.    MS Leisure responded Mr. Morales on Monday, March 11, 2024, explaining, "Upon thorough internal review and consultation with independent third-party experts, we have found substantial evidence that contradicts the claims made in [the termination letter]."

135.    MS Leisure meticulously laid out all the inaccuracies in the County's letter and offered to discuss the matter further to amicably resolve any issues.

136.    On April 3, 2024, after Mr. Morales failed to respond (again), MS Leisure had its counsel reach out to the County Attorney's Office in an attempt to resolve the issue.

137.    After showing the County Attorney's Office the upgrades to the facilities and explaining the errors in the County's position, the decision makers in the County still refused to meet with executives from MS Leisure and The Dolphin Compnay to resolve the issues.

138.    Instead, the County Attorney's Office reconfirmed that the County expected MS Leisure to vacate the premises by April 21, 2024.

**Additional Instances of Retaliation**

139.    After the County's March 7, 2024, Termination Notice, the County has tried to cripple MS Leisure's operation of the Seaquarium.

140.    Since March 7, 2024, the County has conducted 10 "operational inspections."

141.    Before December 12, 2023, inspections officers would only come once a month to the Seaquarium.

142.     The County even went so far to send police officers to the Seaquarium to intimidate and harass MS Leisure.

143.     During the operational inspections, County officials informed MS Leisure that their "superiors" directed them to issue the citations to the Seaquarium.

144.     Several individuals informed MS Leisure that the Mayor's office despised Mr. Albor and his company, based on his statements and emails to the County.

145.     In fact, after Mr. Albor responded to Mr. Perez's email, Edwin Gonzalez, Executive Director of MS Leisure, had a conversation with a high-ranking employee who will be referred to as Employee # 1, about Mr. Perez's letter.

146.     Employee # 1, stated, "No one from the County is going to apologize.  You have a bullseye on our chest."

147.     Furthermore, in January 2024, when the USDA and the County were conducting almost weekly "operational inspections," Mr. Gonzalez asked Employee # 2, "Why are we getting so many inspections?"

148.     Employee # 2 responded, "Because [the Mayor's office] hates you."

149.     Employee # 3 told Mr. Gonzalez in January 2024 that he/she "was being pressured by the County" to conduct inspections.

150.     The Mayor's office has also leaked false information to the media.

151.     For instance, the Mayor's office falsely stated in a letter leaked to the press that the USDA "removed" animals from the Seaquarium, which was completely untrue.

152.     The USDA had to clarify that it did not remove any animals from the Seaquarium.

153.     Furthermore, the County claimed that MS Leisure "violated" USDA requirements, which is completely false.

154.     MS Leisure has been "noncompliant" with USDA rules – mostly based on the Seaquarium's crumbling infrastructure, but after receiving notice, MS Leisure immediately resolved the issue and became "compliant" within the requisite timeframe.

155.     It is important to note that the USDA has the sole authority to remove any animal from any facility that does not comply with its rules and has the sole authority to revoke an operator's license.

156.     The USDA has never removed any animal from the Seaquarium while MS Leisure was in control.

157.     Furthermore, MS Leisure is still licensed by the USDA to operate the Seaquarium and accredited by the Alliance of Marine Mammal Parks and Aquariums (AMMPA).

158.     Despite the numerous attempts by MS Leisure to amicably resolve these issues, the County still refuses to meet, and the County is holding steadfast to eject MS Leisure from the Seaquarium on April 21, 2024.

**What Happens if the lease is terminated?**

159.     MS Leisure is unaware of any permits or licenses secured by the County or any other entity to operate the Seaquarium.

160.     Furthermore, MS Leisure is unaware of entity securing a permit to transfer or transport the animals pursuant to the Endagered Species Act or the Migratory Bird Treaty Act.

161.     If the County precludes MS Leisure from entering the premises, the animals will undoubtedly suffer and will likely perish.

162.     If the County closes the Seaquarium to the public, MS Leisure will be unable to employ its veterinarians, staff, or maintenance workers, which in turn, will cause the animals to suffer and likely perish.

163.    Again, acclimation to new habitats, routines and *caregivers* introduces stress and uncertainty into animals' lives that can greatly impact their health and well-being.

164.    Abruptly closing the Seaquarium to the public is clearly dangerous and potentially fatal for the animals therein.

### COUNT I – VIOLATION OF THE ENDANGERED SPECIES ACT
### AGAINST MIAMI-DADE COUNTY

165.    MS Leisure realleges and incorporates by reference all the allegations set forth in paragraphs 1-164 of the Complaint.

166.    This action is brought by MS Leisure against Miami-Dade County Florida for its violation of the Endangered Species Act (ESA).

167.    MS Leisure houses several animals that qualify as an "endangered" or "threatened" species under the ESA.

168.    The ESA states that it is unlawful for any person or entity to "take, possess, sell, deliver, carry, transport, ship, or receive" any endangered or threatened species, except in very limited circumstances – none of which are applicable here. 16 U.S.C. § 1538(a).

169.    Before an individual or entity can "take, possess, sell, deliver, carry, transport, ship or receive" an endangered or threatened species, such persons must receive a federal permit beforehand. 16 U.S.C. § 1539(a)(1)(B).

170.    To date, no entity has secured a permit under § 1539(a)(1)(B) to take, possess, sell, deliver, carry, transport or ship any of the endangered or threatened species at the Seaquarium.

171.    The County ordered MS Leisure to vacate the Seaquarium by April 21, 2024.

172.    The County's demand violates the ESA.

173.    Should MS Leisure comply with the County, it would also violate the ESA.

24

174.     Moreover, doing so will cause irreparable harm and possible death to the endangered species.

## PRAYER FOR RELIEF AS TO COUNT I

Wherefore, MS Leisure respectfully requests that this Court:

i.      Issue an Emergency Temporary Restraining Order, precluding the County from "taking" the endangered or threatened species pursuant to ESA;

ii.     Enjoin the County from closing the Seaquarium on April 21, 2024, or anytime thereafter, unless and until it receives permission to do so from the USDA, U.S. Fish and Wildlife Service, National Marine Fisheries Services, Florida Fish and Wildlife Conservation Commission, and this Court;

iii.    Declare that the County's plan to eject MS Leisure from the Seaquarium, without any lawful plan of action for the animals, is in violation of the ESA;

iv.     Award MS Leisure all damages, including reasonable attorney's fees and cost pursuant to the ESA; and

v.      Grant MS Leisure any other relief as the Court deems proper and just.

## COUNT II – VIOLATION OF THE MIGRATORY BIRD TREATY ACT AGAINST MIAMI-DADE COUNTY

175.     MS Leisure realleges and incorporates by reference all of the allegations set forth in paragraphs 1-167 of the Complaint.

176.     This action is brought by MS Leisure against Miami-Dade County Florida for its violation of the Migratory Bird Treaty Act.

177.     The MBTA prohibits the "taking" of protected migratory bird species without prior authorization by the U.S. Fish and Wildlife Service.

25

178.    The USDA granted MS Leisure authority to care for the American Flamingos located at the Seaquarium, which are protected under the MBTA.

179.    A special purpose permit is required before any person may lawfully "take, salvage, otherwise acquire, transport, or possess migratory birds." 50 C.F.R. § 21.95.

180.    A special purpose permit for education purposes is required before any covered bird can be taken, acquired, possessed, or transported, and there are specified handling, training, and husbandry requirements necessary for any caretaker of a migratory bird falling into this category.

181.    Transferring or transporting species that are covered by MBTA is not allowed unless and until these requirements are satisfied and a permit issues.

182.    To date, no entity has secured a permit to take, salvage, otherwise acquire, transfer, transport, or possess the migratory birds at the Seaquarium.

183.    The County ordered MS Leisure to vacate the Seaquarium by April 21, 2024.

184.    The County's demand violates the MBTA.

185.    Should MS Leisure comply with the County, it would violate the MBTA.

186.    Moreover, doing so will cause irreparable harm and possible death to the birds.

## PRAYER FOR RELIEF AS TO COUNT II

Wherefore, MS Leisure respectfully requests that this Court:

i.    Issue an Emergency Temporary Restraining Order, precluding the County from "taking" the migratory birds in violation of the MBTA;

ii.    Enjoin the County from closing the Seaquarium on April 21, 2024, or anytime thereafter, unless and until it receives permission to do so from the USDA, U.S.

Fish and Wildlife Service, National Marine Fisheries Services, Florida Fish and Wildlife Conservation Commission, and this Court;

iii. Declare that the County's plan to eject MS Leisure from the Seaquarium, without any lawful plan of action for the birds, is a violation of the MBTA;

iv. Award MS Leisure damages, reasonable attorney's fees and cost; and

v. Grant MS Leisure any other relief as the Court deems proper and just.

**COUNT III: VIOLATION OF FIFTH AMENDMENT TAKINGS CLAUSE**

187.    MS Leisure realleges and incorporates by reference all the allegations set forth in paragraphs 1-167 of the Complaint.

188.    This action is brought by MS Leisure against Miami-Dade County, Florida for its violation of 42 U.S.C. section 1983 for the deprivation of its civil rights caused by the County.

189.    The Miami-Dade County Board of Commissioners delegated its policymaking authority to the Mayor's office to negotiate, execute, and apparently terminate the contract between the County and MS Leisure for the operation of the Seaquarium.

190.    The County's order requiring MS Leisure to vacate the Seaquarium violates the ESA, MBTA, the Animal Welfare Act (AWA), and the Marine Mammal Protection Act (MMPA).

191.    The County's order unilaterally allows it to take possession of MS Leisure's long-term leasehold and its animals – both of which MS Leisure invested a substantial amount of money – without any compensation.

192.    The County's action will harm MS Leisure's economic interest in its animals and leasehold in excess of $35,000,000.00 in damages.

## PRAYER FOR RELIEF AS TO COUNT III

Wherefore, MS Leisure respectfully requests that this Court:

i.   Issue an Emergency Temporary Restraining Order, precluding the County from "taking" its leasehold or animals without compensation;

ii.  Enjoin the County from "taking" its leasehold in the Seaquarium, and the animals therein, on April 21, 2024, or anytime thereafter, unless and until it receives permission to do so from the USDA, U.S. Fish and Wildlife Service, National Marine Fisheries Services, and Florida Fish and Wildlife Conservation Commission, and issues just compensation to MS Leisure in the amount of $35,000,000.00;

iii. Declare that the County's plan to eject MS Leisure from the Seaquarium and confiscate its animals and mammals without any just compensation is a violation of the Fifth Amendment;

iv.  Award MS Leisure just compensation in the amount of $35,000,000.00 for taking its leasehold in the Seaquarium and the animals therein, and reasonable attorney's fees and cost for prosecuting this matter; and

v.   Grant MS Leisure such other relief as the Court deems proper and just.

## COUNT IV – FIRST AMENDMENT VIOLATION – RETALIATION BY MIAMI-DADE COUNTY

193.    MS Leisure re-alleges and incorporates by reference all the statements contained in paragraphs 1-167 of this Complaint.

194.    This action is brought by MS Leisure pursuant to title 42, section 1983, United States Code, for the deprivation of its civil rights by Miami-Dade County.

28

195.     The Miami-Dade County Board of Commissioners delegated its policymaking authority to the Mayor's office to negotiate, execute, and apparently terminate the contract between the County and MS Leisure for the operation of the Seaquarium.

196.     MS Leisure had a First Amendment right to criticize and protest actions taken by County officials while they performed their duties.

197.     The Mayor's office retaliated against MS Leisure for exercising that right, *i.e.* by directing subordinates to issue inapplicable code violations to MS Leisure, and by leaking false information about USDA inspections.

198.     MS Leisure's act of exercising its First Amendment right to protest against the County is constitutionally protected by the First Amendment and was a motivating factor in the decision to direct employees too issue bogus citations to MS Leisure and terminate its valid lease agreement.

199.     The Mayor's office's decision to weaponize County employees to issue bogus citations to MS Leisure would likely deter a similarly situated reasonable person from engaging in similar acts of criticizing County officials while they are performing their duties.

200.     The County delegated policymaking authority to the Mayor's office, and therefore, the Mayor's office decision to retaliate against MS Leisure is considered to be an act by the County.

201.     The County's action, if allowed, will harm MS Leisure's economic interest in its animals and leasehold in excess of $35,000,000.00 in damages.

WHEREFORE, MS Leisure demands judgment for its damages, including economic and non-economic, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

### COUNT V – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
### AGAINST MIAMI-DADE COUNTY

202.    MS Leisure re-alleges and incorporates by reference all the statements contained in paragraphs 1-167 of this Complaint.

203.    This action is brought by MS Leisure pursuant to title 42, section 1983, United States Code, for the deprivation of its civil rights by Miami-Dade County, FL.

204.    The Miami-Dade County Board of Commissioners delegated its policymaking authority to the Mayor's office to negotiate, execute, and apparently terminate the contract between the County and MS Leisure for the operation of the Seaquarium.

205.    The Fourteenth Amendment precludes a state agency or actor from "depriving any person of life liberty, or property, without due process of law."

206.    The due process clause of the Fourteenth Amendment precludes government officials from depriving a person of a protected interests without notice and an opportunity to be heard.

207.    The Mayor's office deprived MS Leisure of its protected interest in its USDA license and operational permit of the Seaquarium.

208.    The Mayor's office violated due process when it unilaterally usurped the authority of the USDA and determined that MS Leisure violated USDA rules, all without notice or an opportunity to be heard.

209.    Mayor's office's unilateral eviction effectively cancels MS Leisure's USDA license and is a violation of due process.

210.    The County delegated policymaking authority to the Mayor's office, and therefore, the Mayor's office's decision to violate due process is considered to be an act by the County.

30

## PRAYER FOR RELIEF AS TO COUNT V

Wherefore, MS Leisure respectfully requests that this Court:

i.   Enjoin the County from finding that MS Leisure "violated" USDA rules unless and until it receives a statement from the USDA and confirmation from this Court making such finding;

ii.   Enjoin the County from using its unilateral finding as a basis to eject MS Leisure from the Seaquarium or confiscate its animals;

iii.   Award MS Leisure damages, reasonable attorney's fees and cost for prosecuting this matter; and

iv.   Grant MS Leisure any other relief as the Court deems proper and just.

## COUNT VI – STATE LAW BREACH OF CONTRACT
## AGAINST MIAMI-DADE COUNTY

211.   MS Leisure re-alleges and incorporates by reference all the statements contained in paragraphs 1-167 of this Complaint.

212.   This action is brought by MS Leisure for breach of contract against Miami-Dade County under Florida Law.

213.   MS Leisure entered into a contract with Miami-Dade County for the right to operate the Seaquarium.

214.   MS Leisure did all, or substantially all, of the essential things which the contract required it to do.

215.   All conditions required by the contract for the County's performance occurred.

216.   The County failed to give MS Leisure a reasonable opportunity to cure any alleged code violations, as stated in the contract.

217.    MS Leisure will damaged by the County's action in excess of $35,000,000.00, should it be removed from the property.

WHEREFORE, MS Leisure demands judgment for its damages, including economic and non-economic, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

### DEMAND FOR JURY TRIAL

MS Leisure demands a jury trial of all issues so triable as of right by a jury.

DATED: April 19, 2024.

Respectfully submitted,

Hilton Napoleon, II, P.A.
Hilton Napoleon, II, Esq., FBN 17593
237 South Dixie Hwy., 4th Floor
Coral Gables, Florida 33133
Telephone: 305-510-7106
hilton@napoleonfirm.com
hiltonnapoleoniipa@gmail.com

*Counsel for the Plaintiff, MS Leisure Corp.*

By: */s/ Hilton Napoleon, II*
           Hilton Napoleon, II